**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMJ GLOBAL ENTERTAINMENT, LLC, individually and on behalf of all others similarly situated,

Plaintiff,

v.

MIGOM GLOBAL CORP., MIGOM BANK LTD., THOMAS A. SCHAETTI, JUERGEN BLAHA, GREGORY DONAHUE, MICHAEL HERZER, BENNO KLEBL, ANDREW WORDSWORTH, JOHANN GUDENUS, STEFAN LENHART, and JOHN DOES 1-12,

Defendants.

Case No. 24-cv-06600-VSB

CORRECTED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

**CLASS ACTION**

Defendant Migom Global Corp. ("Migom Global") a US publicly traded company, and its subsidiary, Defendant Migom Bank Ltd. ("Migom Bank"), licensed in the Commonwealth of Dominica, developed a unique banking business servicing international clients in the fintech, gaming, and crypto industries, quickly gaining hundreds of millions in deposits from around the world swelling the market capitalization of Migom Global to almost $1 billion.

However, Migom's CEO and its largest shareholder, Defendant Thomas Schaetti had been providing fraudulent financial statements to the SEC and Migom's customers while he was in fact funnelling the tens of millions of dollars in customers' deposits into other companies he owned and controlled. The Commonwealth of Dominica has since instituted international criminal proceedings against Schaetti and shut down the bank's operations, while the SEC has suspended trading of Defendants' securities in the US markets, thereby causing a complete loss for all of

Migom's investors amounting to $750 million. Accordingly, Plaintiff files this action individually and on behalf of other similarly situated victims who were damaged by Defendants' fraudulent misrepresentations that their banking business was profitable and growing when, in reality, they were lying to auditors, investors, and US regulatory agencies to conceal the fact that the bank deposits were being diverted and stolen.

## NATURE OF THE ACTION

1. This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between December 6, 2019, and August 25, 2022, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Migom Global Corp. on the OTC Pink Markets or pursuant to other domestic transactions (the "Class").

2. Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

3. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

5. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as Defendants' omissions, misstatements and subsequent damages took place within this District.

6. Migom Global and Migom Bank have offices and employees at 1185 6th Ave, 3rd Floor, New York, NY.

7. Also, Migom Global's stocks are traded through the OTC Markets Group, located in this District.

8. In addition, the acts that constitute the violations of law complained of herein, including Defendants' dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the facilities of the national securities markets.

## PARTIES

10. Plaintiff is a California limited liability company, based in California.

11. On June 6, 2022, Plaintiff acquired Migom Global's securities, in the United States, in reliance upon the truth and accuracy of Migom Global's fraudulent financial statements, which omitted material information and concealed from Migom investors that Schaetti, Blaha and Donahue, with the assistance of Herzer, Klebl, Wordsworth, Gudenus, and Lenhart, had stolen or otherwise misappropriated Migom Bank assets, and diverted Migom Bank client funds. Due to Defendants' fraudulent actions, Plaintiff purchased the securities of Migom Global without knowledge of the omitted facts, and suffered $30,570,000 in losses after the fraud was revealed.

12. Defendant Migom Bank Ltd. ("Migom Bank" or "Bank") is a digital banking institution organized under the laws of the Commonwealth of Dominica with offices, employees, operations, and back office located in New York, NY.

13. Defendant Migom Global Corp. ("Migom Global") is a publicly traded company incorporated in Nevada, and headquartered at 1185 Avenue of the Americas, 3rd Floor, New York, NY 10036.

14. Defendant Thomas A. Schaetti is a foreign national, with an office at 1185 Avenue of the Americas, 3rd Floor, New York, NY. At all relevant times, Schaetti was the controlling shareholder and director of Migom Global, as well as Migom Bank's director and CEO.

15. Juergen Blaha is a foreign national who, at all relevant times, served as Schaetti's deputy and had full access to Migom Bank's correspondent accounts as well as the accounts of multiple Migom-named entities owned by Schaetti individually.

16. Gregory Donahue is a US citizen who, at all relevant times, served as Migom Bank's Treasurer, with an office at 1185 Avenue of the Americas, 3rd Floor, New York, NY.

17. Michael Herzer is a foreign national who, at all relevant times, served as Schaetti's personal consultant and custodian of Migom Global and Migom Bank records which Herzer and Schaetti concealed from US auditors and US regulators.

18. Benno Klebl is a foreign national who, at all relevant times, served as Schaetti's advisor, and aided and abetted Schaetti divert client funds from Migom Bank accounts and channel these funds into unlawful investments.

19. Andrew Wordsworth is a foreign national who, at all relevant times, aided and abetted Schaetti cover up his (Schaetti's) theft of Migom Bank assets and Migom Bank client funds, including by fabricating false police reports and engaging in other activities to conceal Schaetti's wrongdoing.

20. Johann Gudenus is a foreign national who, at all relevant times, aided and abetted Schaetti conduct illegal banking activities, before and after Schaetti had been removed as Director

and CEO of Migom Bank, by order of the Director of the Financial Services Unit of the Government of the Commonwealth of Dominica.

21. Stefan Lenhart is a foreign national who, at all relevant times, was a member of the Board of Directors of Migom Global, and aided and abetted Schaetti steal Migom's funds and channel these funds into personal investments in the name of Schaetti and into Schaetti's companies.

22. These individual Defendants, at all relevant times:

(a) directly participated in the management of Migom;

(b) were directly involved in the day-to-day operations of Migom at the highest levels;

(c) were privy to confidential financial and proprietary information concerning Migom's business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading financial statements and information, as alleged below;

(f) were aware that the false and misleading statements were being issued concerning Migom Global and Migom Bank;

(g) approved or ratified these statements in violation of the federal securities laws;

(h) engaged in a coordinated coverup of Schaetti's activities, including by disseminating false and misleading information via social media and popular websites, filing of false reports with law enforcement authorities in various jurisdictions, falsifying financial reports and other submissions to

US regulatory authorities, and submitting false and misleading claims to block the recapitalization of Migom Bank by new investors, which would have allowed the Bank to resume its operations and Migom Global to recover its market cap.

## FACTS

### The Creation of Migom Bank

23. Migom Bank was established and licensed as an offshore bank in the Commonwealth of Dominica, in August 2019.

24. The Bank was created to serve international clients in the fintech, gaming, and crypto industries, and promoted itself as a disruptor in the banking sector, with low fees, a decentralized business model, and other features devised to serve the underbanked population.

25. In late 2019, the Bank underwent a reverse merger through the acquisition of Migom Global, a US publicly traded company whose stocks are traded on the OTC Pink Markets, in New York, under the trading symbol "MGOM".

26. As a result of the reverse merger, the Bank became the only and wholly owned subsidiary of Migom.

27. From inception, Defendant Schaetti was (and continues to be) Migom Bank's sole Director and majority shareholder, indirectly owning the majority of Migom Global's shares.

### Schaetti Devised a Fraudulent Scheme to Deceive Investors and the SEC

28. In early 2020, following the reverse merger, Migom Global's shares were valued at roughly $3.10.

29. At the time, Defendant Schaetti controlled Migom Bank, as its only Director and CEO.

30. To consolidate his control over Migom Global, Schaetti went on to acquire the majority of its shares, throughout 2020, and became the company's largest 78% shareholder.

31. As Schaetti consolidated his control over Migom Bank and Migom Global, he quickly devised a scheme to steal Migom's funds, and artificially inflate the value of Migom's stocks.

32. First, Schaetti lied to the SEC, by reporting fraudulent financials which falsely represented to the SEC and to investors that Migom Global and Migom Bank's financials were solid and growing. However, Schaetti omitted from Migom Global's financials material adverse information, which, when revealed, caused a precipitous decline in the market value of Migom Global, resulting in millions of dollars in losses and damages to Plaintiff and the Class.

33. Second, Schaetti stole Migom Bank's corporate funds to pursue investments for himself, and for a group of companies he had created to assist him divert assets from Migom Global and Migom Bank.

34. Third, Schaetti, with the assistance of Kebl, Blaha and Donahue, stole tens of millions of dollars of client funds that were deposited into Migom Bank's client accounts, for their personal use.

35. As detailed below, Migom Global stocks, which were valued at $100, in 2021, plummeted to $10, in early 2023, and are now worth $0, after an international criminal investigation uncovered Schaetti's wrongful actions.

**<u>Schaetti Reported Fraudulent Financials to the SEC</u>**

36. In 2020, Migom Global started to report its financials to the SEC.

37. To increase the value of Migom Global stocks, Schaetti, with the assistance of Blaha (Schaetti's personal assistant) and Donahue (Treasurer of Migom Bank), devised a

fraudulent scheme to deceive investors, by reporting fraudulent financials to the SEC that omitted material adverse information regarding Schaetti's theft of Migom Global and Migom Bank's funds.

38. These fraudulent financials stated that Migom Global and Migom Bank's revenues were booming, and omitted that Schaetti and his cohorts, Blaha and Donahue, diverted the Bank's profits and revenues to other companies they own and control, to pursue investments for their own benefit, rather than to the benefit of Migom Global or Migom Bank. These omissions of material information caused investors to form the wrong opinion regarding Migom's operations and profitability, leading Plaintiff and other members of the Class to acquire Migom Global's stocks.

39. For example, under Schaetti's control, the Bank reported substantial profits for 2020 and 2021 with net profits declared to the SEC of $ 1,578 million (2020), $ 12,216 million (2021), and $10,433 million for the nine months ending September 30, 2022.

40. These fabricated financials not only attracted new investors, such as Plaintiff, but assured Migom Global stockholders that the company was thriving, catapulting Migom to a market cap of over $750 million, by early 2021.




41. However, the financial reports that Migom Global submitted to the SEC, under Schaetti's directions, sharply contrasted with the financials Migom Bank submitted to the Dominica authorities, which showed significantly *lower* revenues and profits. The discrepancy between the reports Migom submitted in the US and in Dominica, which Plaintiff only learned recently, emphasizes Schaetti's fraudulent reporting to conceal Migom's true financial state and deceive the US market, US regulators, and US investors. After all, the only financials that showed higher revenues and prosperity were the reports that Migom filed in the US (not in Dominica), indicating Schaetti's efforts to deceive US investors, such as Plaintiff, who acquired Migom Global stocks in the US.

42. In short, Migom Global stocks only went up because the financials showed substantial (yet unreal) profits, solid (yet fabricated) revenues and steady (yet false) growth curve.

43. Even worse, to conceal the discrepancy between Migom Global and Migom Bank financials, Schaetti precluded Migom Global's US auditors from accessing the Bank's financial statements and accounting records.

**<u>Schaetti Stole Millions of Dollars from the Bank and from Migom Account Holders</u>**

44. In addition to deceiving the US market and the SEC, Schaetti manipulated the Bank's financials to conceal his theft of at least $50 million of Migom Bank's funds.

45. The ways through which Schaetti stole the Bank's funds were three-fold.

46. *First*, Schaetti diverted funds from client accounts.

47. Schaetti was able to steal funds from Migom Bank and Migom Global by commingling account holders' deposits and Bank's corporate funds, and then diverting these funds to multiple private companies disguised as Migom Bank affiliates, which Schaetti owned and controlled. These companies were unrelated to Migom Bank, and held bank accounts (to which only Schaetti and Donahue had access) at multiple financial institutions, such as Incore Bank, Transactive Systems UAB in Lithuania, Finci UAB in Latvia, Access Bank in Ghana, PNC Bank, TD Bank, Regions Bank, Synovus Bank, SOKIN (a Canadian Money Service Business), Hillcrest Bank, ABC Bank, Solid Financial and Evolve Bank, Currency Cloud, Thunes, JPMorgan Chase, Moneycorp Bank, Novobank, VPBank, Valens Bank, Euram Bank, Citibank and Bank of America.

48. None of these accounts, however, were held by Migom Bank. Instead, these accounts were held by a company named "Migom Investments SA", a Luxembourg-based company 100% owned and 100% controlled by Schaetti, which is unrelated to Migom Global or Migom Bank. Schaetti and Donahue had exclusive access to these bank accounts and used these accounts to unlawfully move millions of dollars' worth of funds that belong to Migom Bank and Migom Global to their own pockets.

49. In 2020, as part of his fraudulent scheme, Schaetti changed the name of a Luxembourg private company named “Neuenhaus Investments SA” (which he solely owned and controlled), added the word “Migom” to the name of that company and removed the word “Neuanhaus.” Thus, as the resulting company became “Migom Investments SA,” Schaetti was able to deceive account holders, shareholders, investors, and auditors, which believed “Migom Investments” was part of Migom Global and an affiliate of Migom Bank. Schaetti then represented to account holders and auditors that Migom Investments SA was a regulated financial institution, when, in fact, it only had been registered as an electronic money distribution agent of Transactive Systems Ltd., UK. Following Brexit, however, that registration was cancelled and Schaetti had been advised by Luxembourg financial regulators that he could no longer represent his company as a financial institution.

50. Thus, Schaetti, with Blaha and Donahue’s assistance, was able to use “Migom Investments SA” (which is not a licensed financial institution) for substantial off-balance sheet transactions that were not processed through Migom Bank’s official correspondent accounts in Switzerland and Lithuania.

51. For example, rather than keeping funds deposited into Migom Bank’s account holders at a segregated account in Migom Bank’s name, as would be the case in any other legitimate bank, Schaetti directed all those funds to accounts held in the name of “Migom Investments SA” to which only Schaetti had access.

52. Through this fraudulent scheme, Schaetti diverted millions of dollars’ worth of funds that belong to Migom Bank and its account holders, from mid-2020 until early 2023.

53. *Second*, Schaetti used Migom Bank’s funds to pursue investments for his own benefit, without any knowledge or approval of Migom Global’s shareholders, and without ever

providing notice to the Dominica regulators or filing the requisite 8K forms with the SEC.

54. For example, in late 2021 early 2022, Schaetti used Migom Bank clients' funds and the funds of Migom Global to pursue a highly risky investment into the Baltic International Bank ("Baltic"), based in Latvia, totaling approximately EUR 21 million. Schaetti did so without ever obtaining approval of Migom Global's shareholders, and without ever having filed the required Form 8-K with the SEC or notifying the Dominica Regulators.

55. To make the Baltic deal, Schaetti channeled the funds he had diverted from the accounts of Migom Bank's clients and Migom Global, and invested these funds into Baltic in the names of Schaetti, Blaha, Donahue and Klebl, individually.

56. Schaetti's associates Blaha, Donahue and Klebl represented to the Latvian authorities that the funds they had invested into Baltic were their personal funds, and Schaetti claimed to the Latvian authorities that he had received the funds he invested in Baltic from Migom Bank as a performance bonus.

57. However, the representations made by Schaetti and his associates to the Latvian authorities were false.

58. First, Schaetti did not receive any "performance bonus" from Migom, and no such bonus had ever been approved by the shareholders or Migom Global's Board of Directors. In fact, there is no information regarding any performance bonus in any Form 8-K filed by Migom Global.

59. Second, rather than using their personal funds to invest in Baltic, Blaha, Donahue and Klebl used funds which Schaetti had stolen from Migom Bank. Precisely, a portion of those funds in the amount of EUR 13 million Schaetti stole from Migom by diverting Migom Bank funds to external bank accounts in the name of his company "Migom Investments SA" and then transferred these funds to his associates, who invested the amount into Baltic as their own personal

investments. In addition, Schaetti withdrew EUR 1 million from the accounts of Migom Bank's clients and transferred the funds directly to a company belonging to his associate Klebl who falsely claimed to Latvian authorities that he had invested into Baltic EUR 1 million of his personal funds.

60. In August 2022, after his fraudulent investment in Baltic, Schaetti consolidated his sole ownership and control of Migom Global and Migom Bank by buying out the initial seed investors in Migom Bank. And, to accomplish that, Schaetti stole the majority of the accrued profits of Migom Bank and used it as payment for his acquisition of Migom Global stock from Migom's original seed investors, without approval by the shareholders of Migom Global, and without filing the requisite Form 8-K with the SEC, further depleting Migom Global's assets.

61. *Third*, Schaetti covered his tracks by fabricating accounting records, manipulating Migom Global's reported financials, firing employees, and destroying Migom Global and Migom Bank records that would expose his fraudulent activity.

62. Schaetti and Blaha were able to falsify and destroy records, because Schaetti had sole and exclusive access to Migom Bank funds, and controlled the Bank's internal accounting systems. Thus, Schaetti and Blaha had the ability to create (and, indeed, created) false financials and fraudulent accounting records that reflected whatever they felt like reporting, and to destroy the records that would reveal Defendants' fraudulent activity.

63. Herzer actively aided and abetted Schaetti and Blaha in covering up their wrongdoing by hiding the records Schaetti wished to conceal from regulators and auditors, as well as fabricating documents to block investments from any new investors who intended to recapitalize and restore Migom Bank's operations.

64. Furthermore, Gudenas provided protection for Schaetti and his cohorts from the interference of Austrian authorities, as well as by disseminating false media articles to create a

false narrative aimed at disorienting the regulators and shifting blame for the collapse of Migom Bank onto unrelated third parties.

65. Thus, Migom Global's accounting team and Migom Global's US auditors, being denied access to any credible accounting or financial records, were forced by Schaetti, Blaha and Donahue to rely on false and fraudulent information provided by Schaetti.

66. Because the Bank's accountants and auditors did not have access to any of the Bank's records, they had no ability to carry out any independent verification of the information provided by Schaetti.

**Migom's Stocks Plummeted After a Criminal Investigation Uncovered Schaetti's Fraudulent Scheme**

67. In December 2022, following Schaetti's fraudulent investment in Baltic, the Latvian Government shut down Baltic and initiated a criminal investigation targeting Schaetti and Migom Bank for money laundering.

68. In March 2023, prompted by the Latvian Government's investigation, the European Central Bank (ECB) officially revoked Baltic's license, leading to the Baltic's liquidation, and resulting in a complete loss of the EUR 21 million that belong to Migom Bank which Schaetti stole to acquire Baltic.[1]

69. Since then, Schaetti ceased all regulatory reporting to the SEC and ceased even the limited quarterly auditing of the books and records of Migom. Because Migom Global stopped reporting its financials to the SEC, the company became delinquent.

70. In addition, Schaetti's fraudulent actions ruined Migom Bank's correspondent banking arrangements, which are crucial for its operations. By early 2023, Migom Bank had lost

[1] *See* https://eng.lsm.lv/article/economy/banks/24.03.2023-baltic-international-bank-liquidation-process-approved.a502255/.

the ability to conduct essential financial transactions due to the revocation of its correspondent bank licenses and the closure of accounts following audits and enhanced compliance measures that resulted from Schaetti's wrongdoing.

71. Precisely, in March 2023, Migom Bank effectively ceased operations, and Schaetti disbanded the customer support unit and ceased all communication with clients and regulatory bodies.

72. Even worse, all client funds have disappeared, and Migom Bank account holders do not have any information regarding the funds that were once deposited into their accounts.

73. Due to Schaetti's fraudulent activities, the Dominica's authorities directed Migom Bank to immediately cease all its operations, removed Schaetti from his position as Director of Migom Bank, prohibited Migom Bank from accepting any deposits either from new or existing customers, and appointed an Administrator to "recover[] the clients' deposits, repay[] creditors and protect[] public best interest." **Exhibit A**.

74. After being appointed, the Administrator conducted a thorough investigation into Migom Bank's affairs, and found abundant evidence of wrongdoing, including:

a. <u>Unregulated Entities</u>: Migom Investments SA (Luxembourg), Migom Investment FZE (UAE), Migom Verwaltungs GmbH (Austria), Migom Ltd (Ghana), Migom Global Corp (USA), Migom Investments SA LLC (USA), and Spectrum Payments, Inc. (Canada) were not regulated nor authorized by the Financial Services Unit for the Government of Dominica. Schaetti used these entities (which he owns and controls) to unlawfully receive and transfer Migom Bank's depositor funds.

b. <u>Improper Fund Transfers</u>: Schaetti invested approximately EUR 5 million of Migom Bank's funds in Baltic, plus and an additional EUR 1 million disclosed as

his "personal money", which Schaetti withdrew from Migom Bank's Incore Bank (Switzerland) account. These funds were non-segregated and belonged to Migom Bank depositors (not Schaetti).

c. Unauthorized Withdrawals: Schaetti withdrew at least another EUR 14 million from Migom Bank's accounts, and distributed these funds to associates who invested these funds in Baltic as "personal investments" without proper authorization.

d. Unlawful Transactions: Schaetti moved funds from Migom Bank's account at Incore Bank to Baltic to acquire Baltic without regulatory oversight.

e. Misuse of Depositor Funds: Schaetti improperly used Migom Bank funds intended as regulatory capital and for safeguarding depositor accounts without the consent of the Government of Dominica or Migom Bank depositors.

f. Fraudulent Actions: Blaha and Donahue assisted Schaetti and facilitated all those fraudulent transactions.

g. Absence of Live Bank Operating System: There is no evidence of a live bank operating system, including essential compliance data like KYC, AML information, and due diligence, which hindered the tracing and verification of funds.

h. Involvement of Third Parties: Funds were directed to unauthorized third-party companies and organizations without proper legal authorization, including Incore Bank (Switzerland), Finci UAB (Latvia and Lithuania), Transactive Systems UAB (Lithuania), Transactive Systems Ltd (UK), Binance (USA), SFOX Inc. (USA), and Ezbanc Ltd (USA).

i. Criminal Actions: Based on the evidence, the Administrator suggested that criminal proceedings, including domestic and international aspects, are necessary to trace the funds owed to creditors. The key individuals involved in these criminal activities include Schaetti, Blaha, and Donahue.

75. Based on the extensive evidence of criminal activity collected by the Statutory Administration of Migom Bank, the Attorney General's Office of the Commonwealth of Dominica initiated criminal proceedings against Schaetti and others, both in Dominica and internationally.

76. Because of Schaetti's fraudulent scheme, Migom Global, a company that, at its peak, reached a market cap of roughly $750 million, is now virtually worthless, as the SEC suspended all trading of Migom Global's stocks in the US market.

77. Plaintiff and all other Migom Global shareholders have suffered immense financial losses due to Schaetti's fraudulent actions. Migom Global stocks, which were once valued at $100, are now worth $0.

78. In addition, in late 2023, a group of new investors attempted to acquire the majority of Migom Global's stocks, in a legitimate effort to recapitalize Migom Bank, and restore Migom Global's operations. As part of its acquisition of Migom Global, the new investors would conduct a thorough investigation into Migom Bank's banking activities, including, among other things, tracing the funds of Migom Bank clients and Migom Bank assets.

79. Schaetti, however, with Herzer's assistance, obstructed any attempts of these new investors to acquire Migom Global's stocks and restore Migom Bank's operations, by fabricating and concealing records, and initiating legal proceedings based on false documents.

80. Defendants' actions, along with Schaetti's efforts to obstruct and resist efforts by new investors to salvage the bank and restore its operations, form the basis of the Plaintiff's claims

for damages against Schaetti and all other Defendants for their substantial financial and operational mismanagement and fraudulent activities.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

81. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Migom Global during the Class Period, and were damaged upon the revelation of Schaetti's fraudulent scheme. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC Pink market, in New York. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, VStock, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities law.

84. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has

no interests antagonistic to or in conflict with those of the Class.

85. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

86. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Migom Global and Migom Bank;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including by failing to disclose vital negative information in Migom Global's 8K Forms;

(d) whether Defendant Schaetti, with the assistance of all other individual Defendants, caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' fraudulent conduct; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

88. Plaintiff will rely, in part, upon the presumption of reliance established by the *Affiliated Ute* presumption[2] and the fraud-on-the-market doctrine. In fact:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate volume during the Class Period;

(e) the Company traded on the OTC Pink, and was covered by market analysts;

(f) Defendants' fraudulent omissions and representations would tend to induce a reasonable investor to misjudge the value of Migom Global's securities;

(g) Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h) unexpected material news and criminal investigations regarding the Company were rapidly reflected in and incorporated into the Company's stock price during the Class Period.

[2] *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153 (1972).

89. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

90. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Migom Global's securities during the Class Period.

93. The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Migom Global were materially false, omitted material adverse information, and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

94. The Defendants by virtue of their receipt of information reflecting the true facts of

Migom Global, their control over, and/or receipt and/or modification of the Migom Global's allegedly materially misleading statements, and/or their associations with Migom Global which made them privy to financial, accounting, and proprietary information concerning Migom Global and Migom Bank, participated in the fraudulent scheme to defraud investors, stockholders, US auditors, and the SEC.

95. Defendant Schaetti, as Migom Global's controlling shareholder and Director, and as Migom Bank's only Director and CEO, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or other personnel of Migom Global to members of the investing public, including Plaintiff and the Class.

96. As a result of Defendants' false and misleading statements, as well as Defendants' fraudulent omission of key adverse material facts regarding Migom Global and Migom Bank's financials, the market price of Migom Global's securities was inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Migom's securities during the Class Period in purchasing the Company's securities at higher prices that did not reflect Migom Global's market value. In fact, due to Defendants' theft of Migom Global and Migom Bank's funds and fraudulent actions to conceal their criminal actions, the price of Migom Global's securities would have been much lower.

97. Had Plaintiff and the other members of the Class been aware that the market price of Migom Global's securities had been falsely inflated by the Defendants' fraudulent statements and by the material adverse information which the Defendants did not disclose, they would not

have acquired Migom Global's securities at the prices that they did, or at all.

98. Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of the securities of Migom Global plummeted. As a result of their purchases of Migom Global securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

99. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period, which amount to $750 million.

## COUNT II
## Violation of Section 20(a) of the Exchange Act
## Against Schaetti

100. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Defendants made false representations to Plaintiff, which were materially misleading and intended to deceive Plaintiff, resulting in financial losses. These misrepresentations include the financial health of Migom Global and Migom Bank, the safety of Migom investments, and the legality of the operations conducted through Migom Investments SA.

102. As officer and director of a publicly owned company, Schaetti had a duty to disseminate accurate, truthful and thorough information with respect to Migom Global's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading. In addition, Schaetti had a duty to disclose all material information, including adverse information, and could not fail or refuse to disclose any

negative information pertaining to Migom Global or Migom Bank.

103. Because of his position of control and authority as senior officer, Schaetti was able to, and did, in fact, control the contents of the various financial reports, press releases and public filings which Migom Global disseminated in the marketplace during the Class Period. Throughout the Class Period, Schaetti exercised his power and authority to cause Migom Global to engage in the wrongful acts complained of herein.

104. Schaetti, therefore, was a "controlling person[]" of Migom Global within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which inflated the market price of Migom Global's securities.

105. Indeed, as a director and CEO of Migom Global, Schaetti had the power to direct the actions of, and exercised the same to cause, Migom Global to engage in the unlawful acts and wrongful conduct described above. Schaetti exercised control over the general operations of Migom Global and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

106. Therefore, Schaetti is individually liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Migom Global.

## COUNT III
## Breach of Fiduciary Duties Against Schaetti

107. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. As the controlling shareholder, director, and CEO of Migom Global, Schaetti owed fiduciary duties of care, loyalty, and good faith to the shareholders and the corporation.

109. Schaetti breached his fiduciary duties by, among other wrongful acts:

a. Misrepresenting and omitting material information regarding the financial

condition of Migom Global and Migom Bank;

b. Engaging in unauthorized and improper transactions, including diverting funds for his personal gain and investing in Baltic without proper authorization;

c. Failing to segregate depositor funds from corporate funds, leading to commingled accounts;

d. Obstructing regulatory audits and falsifying financial records to conceal his fraudulent activities;

e. Destroying records and manipulating accounting systems to cover up his misappropriation of Migom Global and Migom Bank funds;

f. Diverting funds from client accounts by commingling depositor funds with corporate funds and channeling these funds into accounts of entities controlled by him, such as Migom Investments SA;

g. Using Migom Bank's funds to pursue personal investments, including a EUR 21 million investment in Baltic without shareholder or regulatory approval;

h. Misleading the Latvian authorities about the source of funds he invested in Baltic, by falsely claiming these funds were performance bonuses that he had received from Migom;

i. Blocking and preventing audits by firing employees, destroying records, and fabricating accounting records.

110. As a direct result of Schaetti's breaches of fiduciary duties, Plaintiff and other members of the Class suffered substantial damages in an amount to be proven at trial.

## COUNT IV
**Aiding and Abetting Breach of Fiduciary Duties**
**Against All Other Individual Defendants**

111. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Defendants Blaha, Donahue, Herzer, Klebl, Wordsworth, Gudenus and Stefan Lenhart knew that Schaetti, as the controlling shareholder, director, and CEO of Migom Global, owed fiduciary duties of care, loyalty, and good faith to the shareholders and the corporation.

113. These individual Defendants, however, substantially assisted Schaetti in his breaches of fiduciary duties.

114. Precisely, these Defendants facilitated and assisted Schaetti in diverting Migom funds, falsifying Migom records, and other fraudulent activities, as follows:

a. Juergen Blaha directly assisted Schaetti in diverting funds from Migom Bank to private entities, facilitated misrepresentations and omissions of material facts to US regulators and investors, helped Schaetti falsify Migom financial records to conceal Schaetti's diversion of Migom Global and Migom Bank funds;

b. Gregory Donahue facilitated Schaetti's unauthorized transactions and assisted in covering up Migom Global and Migom Bank's financial discrepancies, stole and transferred Migom Global and Migom Bank funds to accounts controlled by Schaetti, assisted Schaetti misrepresent and omit material financial information of Migom Global and Migom Bank to US regulators and investors;

c. Michael Herzer assisted Schaetti conceal Migom Global and Migom Bank records and aided Schaetti in fabricating documents to mislead auditors and regulators, and assisted Schaetti in obstructing regulatory audits by providing false information;

d. Benno Klebl helped Schaetti divert Migom Bank client funds, assisted Schaetti in engaging in unauthorized and unlawful investments, assisted Schaetti in misrepresenting the source of funds to authorities;

e. Andrew Wordsworth fabricated false police reports, assisted Schaetti's efforts to conceal the theft of millions of dollars of Migom funds, and aided Schaetti in providing false information and omitting material financial information of Migom Global and Migom Bank to mislead regulators and investors;

f. Johann Gudenus leveraged his connections within the Austrian government to shield Schaetti from regulatory scrutiny, allowing Schaetti to operate an unlicensed banking institution in Vienna; Gudenus also utilized his connections with media and public relations outlets to disseminate false information and assist Schaetti in covering up his illicit activities; Gudenus also provided Schaetti with access to alleged organized crime figures in Serbia and elsewhere in Eastern Europe and Turkey, with the purpose of intimidating Migom's clients and investors as well as with the purpose of expanding Schaetti's illicit banking activities;

g. Stefan Lenhart assisted Schaetti steal Migom Global and Migom Bank funds and channel these funds into investments meant to benefit Schaetti personally.

115. As a result of these actions, Plaintiff and other members of the Class suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

116. Plaintiff demands judgment against Defendants, as follows:

a. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying

Plaintiff as the Class representative;

b. Awarding compensatory damages in the amount of $750 million, including compensatory damages to the Plaintiff, in the amount of 30,570,000;

c. Awarding punitive damages due to Defendants' malicious and egregious conduct;

d. Ordering restitution and disgorgement of ill-gotten gains from Defendants;

e. Granting injunctive relief to prevent further violations;

f. Granting injunctive relief to remove Schaetti as Director and CEO of Migom Global;

g. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

h. Awarding such other and further relief as the Court deems just and proper.

**JURY DEMAND**

117. Plaintiff demands a trial by jury on all issues so triable.

Dated: September 9, 2024.

Respectfully submitted,

**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, FL 33127
Tel: 305.297.1878

By: */s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess
jeff@axslawgroup.com
Bernardo N. de Mello Franco
bernardo@axslawgroup.com
eservice@axslawgroup.com

*Counsel for AMJ Global Entertainment, LLC*